# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

DEBORAH JEAN WYATT,     )
                          )
     Plaintiff,          )     Case No. 3:14-cv-02287
                          )     Senior Judge Haynes
v.                   )
                          )
CAROLYN W. COLVIN,     )
Acting Commissioner of Social Security,     )
                          )
     Defendant.         )

## M E M O R A N D U M

Plaintiff, Deborah Jean Wyatt, filed this action under 42 U.S.C. § 405(g) against the Defendant Carolyn Colvin, Acting Commissioner of Social Security, seeking judicial review of the Commissioner's denial of her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.

Before the Court is Plaintiff's motion for judgment on the record (Docket Entry No. 12) contending, in sum, that the Administrative Law Judge ("ALJ") erred by (1) failing to adhere to the treating physician rule; (2) failing to find Plaintiff credible regarding her efforts at pain relief; and (3) by failing to credit Plaintiff's assertions about her "good days" and "bad days." The Commissioner contends that the ALJ's decision is supported by substantial evidence.

After a hearing, the ALJ evaluated Plaintiff's claim for SSI using the sequential evaluation process set forth at 20 C.F.R. § 416.920. (Docket Entry No. 10, Administrative Record at 18).[1] The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2015. Id. at 20.

---

[1]The Court's citations are to the pagination in the Administrative Record, not in the electronic case filing system.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 16, 2010, the alleged onset date of her disability, and that Plaintiff's earnings after that date were short-term disability payments, not the result of substantial gainful activity. Id.

At step two, the ALJ determined that Plaintiff has the following severe impairments: rheumatoid arthritis, degenerative joint disease of the knees, and obesity. Id.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. at 21.

At step four, the ALJ determined that Plaintiff had the residual functional capacity to perform light work, specifically, to lift up to twenty-five pounds occasionally, carry up to twenty-five pounds occasionally, sit for a total of six hours in an eight-hour workday, two hours at a time, stand for a total of four hours in an eight-hour workday, one hour at a time, and walk for a total of three hours in an eight-hour workday, thirty minutes at a time, cannot frequently handle or finger with the bilateral upper extremities, can only occasionally reach and push/pull with the bilateral upper extremities, can only occasionally use feet for foot controls, cannot work around unprotected heights or extremes of cold temperatures, can occasionally work around moving mechanical parts, a motorized vehicle, and vibrations. Id.

At step five, the ALJ stated that Plaintiff is capable of performing past relevant work as an inserter, a cashier and a packer. Id. at 28. The ALJ concluded that Plaintiff was not disabled within the meaning of the Act and was not entitled to benefits. Id. Following this decision, Plaintiff requested a review. Id. at 13-14. On October 29, 2014, the Appeals Council denied Plaintiff's request for review. Id. at 1-5.

2

## A. Review of the Record

Plaintiff's alleged onset date of disability is June 16, 2010. (Docket Entry No. 10, Administrative Record, at 124). Plaintiff has submitted medical records that predate her onset date of disability.

On January 12, 2010, Plaintiff visited Concentra and stated that she sustained a work-related injury when "she had a box of books fall from head height and strike her on the left thigh. Since then she has had left pain made worse on walking and better at rest." Id. at 236.

On January 15, 2010, Plaintiff returned to Concentra "for a recheck for the injury[.]" Id. at 234-35. Plaintiff stated that "[s]ince last visit she has had some improvement but still has some tightness in the thigh when sitting. Modified duty is going well. The medication helps." Id. at 234. Upon examination, Dr. Jim Scott noted that "[s]he is in no distress. Gait is normal." Id.

On January 20, 2010, Plaintiff returned to Concentra "for a recheck for the injury[.]" Id. at 230-33. Plaintiff reported that "[s]he feels the pattern of symptoms is no better. ... Patient has been taking their medications and has noted no relief in pain." Id. at 230. Plaintiff was prescribed Medrol, a pain medication. Id. at 231. Plaintiff's activity was modified within these limitations: "[o]ff work rest of shift with limited activity as follows," "[n]o squatting, kneeling, or climbing stairs or ladders," "[n]o prolonged standing/walking longer than 30 minutes per hour," "[s]hould be sitting 50 percent of time," "[m]ust wear brace." Id.

On January 23, 2010, Plaintiff returned to Concentra "for a recheck for the injury[.]" Id. at 228-29. Plaintiff stated that "[s]he feels the pattern of symptoms is improving in regards to her thigh." Id. at 228. Plaintiff complained that the Medrol was causing throat pain, but the doctor wrote that "I doubt the steroid is the cause of her gland problem. ... I believe swollen gland is due

to infective process or stone in salivary duct." Id.

On January 27, 2010, Plaintiff returned to Concentra "for a recheck for the injury[.]" Id. at 225-27. Plaintiff reported that "[s]he feels the pattern of symptoms is no better in the knee but the thigh is better. ... The pain is described as moderate and constant. ... Pain is 8/10." Id. at 225. Plaintiff was no longer taking the Medrol for pain relief. Id. Plaintiff was prescribed Etodolac, an anti-inflammatory, Ultram, a pain medication, and Acetaminophen/Hydrocodone, another pain medication. Id. Plaintiff's work activity was modified within these limits: [o]ff work rest of shift with limited activity as follows," "[n]o squatting," "[n]o kneeling," "[n]o climbing stairs or ladders," "[s]hould be sitting 75 percent of time," "[n]o prolonged standing/walking longer than 20 minutes per hour." Id. at 226.

On February 5, 2010, Plaintiff returned to Concentra "for a recheck for the injury[.]" Id. at 222-24. Plaintiff stated that "[s]he feels the pattern of symptoms is improving and feels better." Id. at 222. Plaintiff's activity was modified within these limits: "[n]o squatting, kneeling, or climbing stairs or ladders," "[n]o prolonged standing/walking longer than 30 minutes per hour," "[s]hould be sitting 50 percent of time," and "[m]ust wear brace." Id. at 223. At the time, Plaintiff's doctor anticipated that a trial of full duty work could be performed in one week. Id.

On February 5, 2010, Plaintiff's physical therapist wrote that Plaintiff was "progressing well," and that Plaintiff "reports that her knee is minimally better. [R]eports that she is standing all day at work which is causing increased knee pain." Id. at 248.

On February 10, 2010, Plaintiff returned to Concentra and the treatment notes reflect:

Mrs. Wyatt was improving and pain free until she fell on the ice this morning at home. I had anticipated a trial of full duty at this time. Her pain from her fall is in her low back and now in her knee. ... Patient has had physical therapy for a total of

6 visits and improved until today[']s fall.

...

Mrs. Wyatt[']s thigh injury has improved. Unfortunately she has now injured her knee in the fall. I would like a trial of full duty to see how she does at work. Patient is not released from care.

Id. at 219-21.

On February 10, 2010, Plaintiff's physical therapist wrote that Plaintiff had "plateaued ... had not been making much progress[.]" Id. at 247.

On February 16, 2010, a lumbar spine series was conducted due to Plaintiff's fall. Id. at 241-42. The test showed that Plaintiff's "[i]ntervertebral disc spaces are normal and there are no compression fractures." Id. at 241. The test was "negative." Id. A test of the right knee was also conducted and showed that "[b]one density is uniform. There is no joint effusion. Surrounding soft tissues are unremarkable." Id. at 242. The test showed "[d]egenerative change only." Id.

On February 18, 2010, Plaintiff visited Concentra "for a recheck for the injury[.]" Id. at 217-18. Plaintiff's doctor wrote as her history:

Since her last visit here on 2/10/10 she has had a complicated course. At her last visit a trial of full duty was planned but before she could report for work she slipped and fell on an icy surface at her home aggravating her left knee pain and incurring other injuries for which she has sought treatment at this urgent care center until she can see her [primary care physician] on 3/3/10. Overall since the day of her original injury she thinks the left knee is about 90% improved.

Id. at 217. At the time of the visit, there was "no instability" and Plaintiff was "is no acute distress." Id. Plaintiff continued her prescriptions for Methocarbamol, a muscle relaxant, Darvocet, a mild pain medication, and Tylenol. Id. Upon examination, Plaintiff noted that her knee was "hurting really bad. It feels like a sharp pain." Id. at 218.

On February 24, 2010, Plaintiff returned to Concentra "for a recheck for the injury[.]" Id. at 214-16. Plaintiff stated her "pattern of symptoms is about the same" and that she "[f]eels that she may be up on it too much." Id. at 214. Plaintiff reported that she "[s]till has left medial knee pain and some resolving bruising. States that her pain is 8/10 at work especially with sitting to standing and starting to walk after extended sitting." Id. Due to Plaintiff's pain, her work restrictions were continued. Id. At the time, Plaintiff's prescribed medications were Darvocet, a mild pain medication, Robaxin, a muscle relaxant, and Mobic, an anti-inflammatory. Id.

On March 3, 2010, Plaintiff visited Dr. Harley Odom "to establish herself with [him] as her new physician." Id. at 389-92. Plaintiff had several complaints: hypertension, back pain that "started when she slipped on the ice and fell on her backside 2 3 weeks ago," a knee contusion caused by "[a] box [that] fell on her left knee and gave her a contusion six weeks ago," and allergic rhinitis that was stable. Id. at 389. Dr. Odom referred Plaintiff to physical therapy for her back, and wrote that "[Plaintiff] will take the next four days off from work (including the weekend) and avoid any lifting or strenuous activity over that time." Id. at 391. Diet, exercise, and weight loss strategies "were recommended and discussed with the patient at length." Id.

On March 8, 2010, Plaintiff visited Concentra"for a recheck for the injury[.]" Id. at 212-13. Plaintiff reported that "the pattern of symptoms is improving and feels better. ... Plaintiff has had physical therapy and feels better." Id. at 212. On this visit, Plaintiff reached maximum medical improvement. Id. On physical examination, Plaintiff stated that she had "pain esp[ecially] [with] getting up [and] down. [Complaints of] stiffness when in one position too long." Id. at 213.

On March 8, 2010, Plaintiff's physical therapist wrote that Plaintiff had "plateaued ... due to continued pain [and] [symptoms] [approximately] 2 mo later." Id. at 245.

6

On April 2, 2010, Plaintiff underwent an MRI of her lumbar spine. Id. at 386-88. The procedure showed "mild to moderate hypertrophic changes of the facets at L3-4 and ligamenta flava hypertrophy ... causing a mild stenosis of both lateral recesses and a borderline stenosis of the spinal canal[,]" but "[n]o disk pathology is seen at any level." Id. at 386. Dr. Horace E. Watson observed that Plaintiff was "a considerably overweight lady who stands and walks with a slow cautious gait. She has limited motion in the lower back about 50% of the normal range. She is tender at both sacroiliac joints." Id. at 387. Dr. Watson administered a sacroiliac joint injection and Plaintiff "tolerated the procedure well and indicated improvement after the injection." Id. at 388.

On April 5, 2010, Plaintiff visited Dr. Odom at Vanderbilt complaining of back pain, hypertension and anemia. Id. at 383-85. Dr. Odom wrote that he was "[p]leased [Plaintiff]'s feeling better" due to a new prescription of Diclofenac. Id. at 385. Dr. Odom referred Plaintiff to a gasterentologist and counseled her on diet and exercise. Id.

On April 13, 2010, Plaintiff visited Dr. Brandon Downs for an initial visit. Id. at 291. At the time, Plaintiff was "5 feet 1 inch in height, weighing 200 pounds." Id. Plaintiff described that "back in January she ... hit the top of her knee," that "in February she slipped on the ice" and that "she has been going to physical therapy." Id. Plaintiff felt "that she has made no improvement since her initial injury back in January." Id. Plaintiff stated that "she is not hurting at this time but [her knee] does hurt at the level of a 6/10 on occasion." Id. Upon examination, Plaintiff "ambulate[d] with a normal gait and station." Id. There were "[f]our views of the left knee" taken, but they showed "[n]o lytic or blastic lesions," "[n]o fractures or dislocations," and "[n]o abnormalities[.]" Id. Dr. Downs suggested physical therapy, a home exercise program, use of ice, and a prescription for an anti-inflammatory. Id. Dr. Downs "ke[pt] her on regular duty with no restrictions at this time." Id.

Dr. Downs also completed a "medical status form" and wrote that Plaintiff could return to full duty the next day, on April 14, 2010. Id. at 322.

On May 12, 2010, Plaintiff visited Results Physiotherapy and "[d]esribes 60% improvement to date." Id. at 262. Plaintiff's "[s]ubjective pain [was] not progressing at same rate as objective signs but [Plaintiff had] fair compliance with exercise/attendance." Id.

On May 13, 2010, Plaintiff visited Dr. Downs and "state[d] that she is still hurting at a 9/10 level. [Plaintiff] state[d] that she is not getting any better." Id. at 289. Dr. Downs discussed with Plaintiff that "one of the difficult things is that she is making good improvement with regards to her physical therapy with regards to the objective findings, but her pain is not improving at the same rate." Id. Dr. Downs ordered an MRI, suspended physical therapy, and "ke[pt] [Plaintiff] on limited duty with seated work mostly with limited standing and walking at this time." Id. Dr. Downs also prescribed Darvocet, a moderate pain medication. Id.

On May 18, 2010, Plaintiff visited Premier Orthopaedics for an MRI of her left knee. Id. at 303. The MRI showed a "[s]mall longitudinal tear in the posterior horn of the medial meniscus contacting the tibial surface near the meniscal root, with mild free edge blunting," "[p]atell[]ofemoral osteoarthritis. Moderate articular cartilage loss at the lateral facet of the patella with subchondral marrow edema. Mild chondromalacia in the femoral trochlea," "[m]oderate joint effusion extending into a 4.2 cm popliteal cyst. Soft tissue edema and fluid extends caudally from the cyst along the medial gastrocnemius, suggesting recent leak or rupture of the cyst," "[m]oderate muscular strain of the popliteus. Mild strain of the medial gastrocnemius," "[l]ateral subluxation of the patella with respect to the femoral trochlea by 5 mm. Trochlear-tubercle distance measures 1.9 cm," and "[m]ild patellar tendinosis." Id. Dr. Downs also completed a "medical status form"

8

and did not list any restrictions for Plaintiff to return to work. Id. at 321.

On May 21, 2010, Plaintiff visited Vanderbilt's orthopaedic clinic with "recurrent discomfort on the right side, but her left side continues to do well." Id. at 379. Dr. Watson considered administering another sacroiliac joint injection, "but [Plaintiff] elected to proceed with a nonsteroidal anti-inflammatory medicine." Id.

On May 25, 2010, Plaintiff visited Vanderbilt's orthopaedic clinic for a sacroiliac joint injection. Id. at 378. Plaintiff "responded well" to the previous injections but "just a few days ago" Plaintiff visited Dr. Watson again, as "she was having some recurrent discomfort particularly on the right side, though her left side had continued to do well." Id. At this appointment, "both left and right sides of her lower back are painful ... [a]ny stress applied to those joints produces her pain." Id. Plaintiff received another injection, and "indicated some improvement after the injections[.]" Id.

On May 27, 2010, Plaintiff visited Dr. Downs and "report[ed] that her pain has continued since the time of her last visit." Id. at 288. Upon examination, Plaintiff "ambulate[d] with an antalgic gait on her left lower extremity." Id. Dr. Downs reviewed the MRI scan conducted on May 18, 2010 and observed:

> There is longitudinal tearing of the posterior horn of the medical meniscus. The tear is noted to contact the tibial surface near the meniscal root. There is noted to be mild free edge blunting. There is patellofemoral osteoarthrosis. There is chondromalacia in the femoral trochlea. There is a mild joint effusion with a 4.2 am popliteal cyst. Fluid extending caudally from the cyst along the medial gastrocnemius suggests recent leak or rupture. There is a moderate strain of the popliteus with a mild strain of the medial gastrocnemius. There is lateral subluxation of the patella. There is mild patellar tendinosis.

Id. Dr. Downs suggested Plaintiff undergo a left knee arthroscopy with partial medial meniscectomy

and chondroplasty and Plaintiff agreed to the procedure. Id. Plaintiff was placed on "limited duty at this point. She should avoid lifting, carrying, twisting and kneeling. She must sit 10 minutes per hour." Id. Dr. Downs prescribed an anti-inflammatory. Id.

On August 9, 2010, Plaintiff visited Dr. Odom at Vanderbilt and complained of chest pain. Id. at 373-77. Dr. Odom also noted that Plaintiff experienced "increased edema in her legs," hypertension, and anemia that "[s]he has not yet followed [through] with seeing [a doctor] ... just procrastinating apparently[.]" Id. at 374. Dr. Odom recommended that Plaintiff begin a "[h]ealthy diet ... limiting concentrated sweets, starches, saturated fat, and overall calories but rich in lean meats, vegetables, whole grains" and exercise although her "ability [was] limited by comorbidities." Id. at 377.

On August 19, 2010, Plaintiff visited Vanderbilt's Heart Clinic. Id. at 370-72. Plaintiff was experiencing chest pains and underwent a stress echocardiogram that showed "no ischemic ST-T changes" and was a "[n]egative stress echo[cardiogram]." Id. at 370.

On August 23, 2010, Plaintiff was discharged from Results Physiotherapy after making "objective progress," although she "seemed to regress at around 7 visits." Id. at 261.

On August 23, 2010, Plaintiff visited Dr. Watson at Vanderbilt's orthopaedic clinic for sacroiliac joint injections. Id. at 369. Plaintiff had experienced "an excellent response" to the previous injections, although "recently she has had a recurrence of that pain." Id. Plaintiff received another set of injections and "tolerated the procedures well." Id.

On August 27, 2010, Plaintiff underwent a "[l]eft knee arthroscopy with partial medial and lateral meniscectomy" and a "[l]eft knee chondroplasty of patella and trochlea (separate compartment)." Id. at 300-02. Dr. Downs performed the procedures and "[t]here were no post-

operative complications noted." Id. at 302.

On September 9, 2010, Plaintiff visited Dr. Downs and "state[d] that she feels sore at this time but overall is 'okay.'" Id. at 287. Plaintiff was still using crutches "at times" and taking Lortab for pain. Id. Upon examination, Plaintiff "ambulate[d] with a mildly antalgic gait favoring her left knee and walking with the assistance of crutches." Id. Dr. Downs prescribed physical therapy two to three times a week for four weeks, the use of ice, elevation, and wrapping of Plaintiff's knee, and Mobic, an anti-inflammatory. Id. Dr. Downs wrote that Plaintiff "may be limited duty with sitting work mostly with limited walking and standing at this time." Id.

On September 10, 2010, Dr. Downs completed a "medical status form" and restricted Plaintiff to all three of the limitations in the "lower extremities" section: "[f]ull work with support," "[f]ull work with sitting. Limit walking, standing. Must sit 5-10 minutes every (1) hours," and "[n]o squatting, kneeling, or crawling." Id. at 316.

On September 16, 2010, Plaintiff visited Results Physiotherapy for an "initial evaluation." Id. at 259. Plaintiff's primary complaint was "tenderness in knee" and she reported that the injury was caused "at work pulling boxes that fell and she twisted her foot that was planted." Id.

On September 29, 2010, Plaintiff returned to Results Physiotherapy and "report[ed] walking better – more aware of what to do right." Id. at 255. Plaintiff was "progressing well[.]" Id.

On October 8, 2010, Plaintiff visited Dr. Downs and "report[ed] she is feeling improvement of her comfort, range of motion and strength" and was "pleased with her progress to this time." Id. at 286. Upon examination, Plaintiff "ambulate[d] with a normal gait and station." Id. Dr. Downs was also "pleased with [Plaintiff's] progress" and Plaintiff was to "continue to perform sitting work with limited standing and walking." Id. Dr. Downs completed paperwork showing that

11

Plaintiff was on limited work duty and for restrictions wrote "continue current." Id. at 315.

On October 23, 2010, Plaintiff returned to Dr. Downs "due to increased pain and swelling at this time. [Plaintiff] state[d] she has had more soreness and stiffness as of late." Id. at 285. Upon examination, Plaintiff "ambulate[d] with a mildly antalgic gait at this time." Id. Dr. Downs suggested that Plaintiff wear a knee brace to alleviate the swelling and stiffness. Id.

On October 27, 2010, Plaintiff visited Dr. Odom at Vanderbilt "complaining of multisite joint pain." Id. at 366-68. Plaintiff reported that she had "chronic knee pain with degenerative changes ... still bothers her with discomfort when walking" and "now her right knee has similar or even worse symptoms over the past few weeks, with stiffness, 4/10 discomfort, dull and achy in character, but no other exacerbating/alleviating factors noted." Id. at 366. Regarding her weight, Dr. Odom wrote that "[Plaintiff] tries to follow low sodium diet, but her joints preventing her from exercising she states. She has not lost any weight." Id. Plaintiff was diagnosed with "[j]oint pain, multi-site, probably degenerative in nature," "[h]ypertension, suboptimally controlled" and "[o]verweight status/obesity." Id. at 367. Dr. Odom referred Plaintiff for x-rays, blood work, and steroid injections. Id. at 368.

On October 28, 2010, Dr. Downs completed paperwork showing that Plaintiff was on limited work duty and wrote for restrictions, "no [change]." Id. at 314.

On October 28, 2010, Plaintiff visited Vanderbilt for imaging of her knees. Id. at 365. The imaging showed "[m]ild medial compartment joint space narrowing with marginal osteophyte formation," "[m]inimal patellofemoral joint osteophyte formation with preservation of joint space," and "[m]ild interconcylar osteophyte formation" in the right knee, and "[s]imilar mild medial compartment joint space narrowing with mild intercondylar osteophyte formation" and

"[p]atellofemoral joint space maintained" in the left knee. Id.

On November 3, 2010, Plaintiff visited Results Physiotherapy and "report[ed] stiffness in knee over past weekend. [Plaintiff] report[ed] a catch in knee when going from sit [to] stand." Id. at 265. Plaintiff was "progressing [with] [increased] knee flexion [range of motion] [and] is now slowly returning to work activities." Id.

On November 8, 2010, Plaintiff visited Dr. Watson at Vanderbilt's orthopaedic clinic for another set of sacroiliac joint injections. Id. at 363. The previous injection "had a good response" but Plaintiff reported "continue[d] ... low back pain," although she was "5/5 in motor function in both lower extremities." Id.

On November 15, 2010, Plaintiff visited Results Physiotherapy for a "re-evaluation." Id. at 253. Plaintiff had a "functional score" of 62, compared to a functional score of 52 at the initial evaluation. Id. Plaintiff also reported pain at a level of four out of ten, and "70% improvement. [Plaintiff] report[ed] able to walk better [and] [decreased] soreness in knee." Id. Plaintiff's rehabilitation potential was "fair" and it was suggested she receive two to three sessions of physical therapy per week for three to four weeks. Id. Plaintiff's long term goals included being "able to return to work [without] restrictions." Id.

On November 19, 2010, Plaintiff visited Dr. Odom at Vanderbilt "for followup of multiple medical problems and symptoms including her joint pain or an elevated blood pressure, and allergic rhinitis." Id. at 360-62. Dr. Odom suspected that Plaintiff had "probable rheumatoid arthritis." Id. at 360. Plaintiff reported that due to her new prescription, Diclofenac, and the steroid injections "her symptoms have subsided to some degree with less stiffness and swelling in her hands in particular. No new areas of joint pain." Id. Dr Odom referred Plaintiff to the rheumatology clinic

and counseled Plaintiff to start "a low sodium diet, with increased aerobic exercise and fitness. She will stick with low impact exercise given her joint issues." Id. at 361-62.

On December 1, 2010, Plaintiff visited Dr. Cara Hammonds at Vanderbilt's rheumatology clinic "for evaluation of positive rheumatoid factor and joint pain." Id. at 357-59. Plaintiff reported that "she has had the onset of sore hand/wrist/elbow pain over the last 3-4 months," stiffness in her knees, and swelling in her left wrist and ankle. Id. at 357. Dr. Hammonds noted that Plaintiff's "inflammatory arthritis" was likely "seropositive [rheumatoid arthritis]." Id. at 359.

On December 2, 2010, Plaintiff visited Results Physiotherapy and "report[ed] 60-70% improvement." Id. at 252.

On December 3, 2010, Plaintiff visited Dr. Downs and "report[e]d that she has had some improved comfort since the time of her last visit. She report[ed] that she does have some soreness in her knee at times." Id. at 284. Upon examination, Plaintiff "ambulate[d] with a normal gait and station." Id. Dr. Downs was "pleased with [Plaintiff's] progress" and "place[d] [Plaintiff] at regular duty status." Id.

On December 9, 2010, Plaintiff visited Results Physiotherapy with complaints of "[increased] stiffness/[pain] this week." Id. at 250. Plaintiff's "MD ha[d] ordered 3 more weeks [physical therapy]." Id.

On December 15, 2010, Plaintiff returned to Results Physiotherapy with an "antalgic gait" and "stiffness." Id. at 249.

On December 16, 2010, Plaintiff visited Dr. Hammonds at Vanderbilt's rheumatology clinic. Id. at 351-53. Plaintiff complained of "worsening of pain (hands, wrists, shoulders, elbows, knees) since her last visit." Id. at 351. Regarding work, Plaintiff was "supposed to go back to work on

14

Monday, but doesn't think she will be able to. Her job requires quite a bit of walking which she doesn't think she can do." Id. Dr. Hammonds filled out FMLA paperwork for Plaintiff, and a "small form ... saying that it is ok for the patient to be off from work for the next 4 weeks." Id. at 352.

On December 27, 2010, Plaintiff visited Dr. Downs and "report[ed] that she has had some continued pain in her left knee since the time of her last visit." Id. at 282-83. Plaintiff stated that "she has been referred from her primary care physician to a rheumatologist. ... [Plaintiff] states that the rheumatologist has placed her as an off work status." Id. at 282. Upon examination, Plaintiff "ambulate[d] with a normal gait and station." Id. Dr. Downs discussed with Plaintiff a "viscosupplementation series." Id. Dr. Downs "fe[lt] the injection series would be very likely to provide improvement to the patient's discomfort, stiffness and swelling." Id. Dr. Downs submitted the request for the viscosupplementation series for approval from "the Worker's Compensation insurer." Id. at 283. Dr. Downs completed paperwork showing Plaintiff was on regular work duty. Id. at 311.

On January 7, 2011, Plaintiff visited Vanderbilt "for evaluation and management of chronic conditions/symptoms[.]" Id. at 348-50. Plaintiff's diagnosis of rheumatoid arthritis was recently confirmed and due to new prescriptions Plaintiff "is already feeling some better with less pain and stiffness, less swelling in her hands. No other joint focal pain, swelling, or new stiffness." Id. at 348. Dr. Odom wrote that Plaintiff was "off work currently while her disease is being brought under control. Hopefully she will be a return to work, but is suspect it may have to be low impact, desk job type capacity." Id. at 350.

On January 20, 2011, Plaintiff visited Dr. Hammonds at Vanderbilt's rheumatology clinic with "recently [diagnosed] Seropositive [Rheumatoid Arthritis]." Id. at 344-47. Plaintiff had been

"off work since [December 16, 2010] for joint pain/stiffness and difficulty walking/bending" and "report[ed] that she cannot functionally do her job at this time." Id. at 344. Dr. Hammonds "filled out a form for [Plaintiff] to be off for the next 6 weeks (until next [appointment])." Id. at 345.

On February 6, 2011, Plaintiff visited Vanderbilt's orthopaedic clinic for sacroiliac joint injections. Id. at 343. After the prior injections, Plaintiff had a "good response," but after two months "it began to be painful again." Id. Plaintiff reported that "she has not worked now for about six weeks." Id. Plaintiff received another injection. Id.

On March 3, 3011, Plaintiff visited Vanderbilt's rheumatology clinic and stated that "she continues to be off work since [her previous appointment] for joint pain/stiffness and difficulty walking/bending and is applying for disability. Her joint pain continues to improve (hands/wrists/elbows). She continues to have low back pain and leg pain." Id. at 339-42. The doctor also noted that Plaintiff "has gained 15 [pounds] since November. She admits to snacking late at night." Id. at 339. At this appointment, Dr. Hammonds "filled out a form today for the patient to be off indefinitely given her inability to perform her job functions at this time." Id. at 340.

On April 7, 2011, Plaintiff visited Dr. Downs and "report[ed] that she is having continued pain since the time of her last visit." Id. at 281. Upon examination, Plaintiff "ambulate[d] with a normal gait and station." Id. At the time, Plaintiff was awaiting approval for a series of viscosupplementation injections and had been waiting since December 2010. Id. Dr. Downs completed paperwork showing Plaintiff was on regular work duty. Id. at 309.

On April 26, 2011, Plaintiff completed a function report. Id. at 154-61. Plaintiff wrote that her conditions limited her because "I can't sit, stand, or walk or hold things for a long period of time. And with my medication I can't drive that much. And some of my medication makes me dizzy."

16

Id. at 154. Plaintiff wrote that she was sometimes limited in her ability to dress, bathe, care for hair, use the toilet, and get out of cars and chairs due to pain. Id. at 155. Plaintiff could still go to the "stor[e] for food, church, go out to eat, to pay bills sometime[s]," but did not "go out as much with my husband [and] friends like I use[d] to. Id. at 156-57. Plaintiff's condition affected her ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs, use her hands, and get along with others. Id. at 157. Specifically, Plaintiff wrote that "[i]t's hard for me to lift 5 lb or more, walking maybe 50 feet before I get tired and have to sit down, getting around ... I need a walking stick, everything I marked gives me pain when I try to do them like I use[d] to." Id. Plaintiff used a brace "to help relieve the pain some" and a cane "for support," and she used these aids "[s]ometime[s] when walking if I am hurting sometime[s] when I go to the stor[e] if my husband isn't with me or someone else." Id. at 158. Plaintiff reported that she did not have any side effects from her medications, writing, "[a]s for the medicine I am taking all have said [e]ffects but I don't think I have any." Id. at 161.

On May 5, 2011, Plaintiff visited Dr. Downs for the first of five viscosupplementation injections. Id. at 280. Upon examination, Plaintiff "ambulate[d] with a mildly antalgic gait." Id. Dr. Downs administered the injection, and although "no injection site reaction was noted," Plaintiff "did cry for several minutes and stated that she was in severe pain from the injection." Id. Dr. Downs was "unsure if the patient will continue with the injections due to the level of discomfort that she experienced from the first injection." Id. Dr. Downs completed paperwork showing that Plaintiff was on regular work duty. Id. at 308.

On May 7, 2011, Plaintiff visited Vanderbilt's rheumatology clinic and reported "some joint pain" but that she "does pretty well first thing in the morning." Id. at 335-37. Plaintiff had also

"gained about 7 more [pounds] since her last visit." Id. Regarding Plaintiff's osteoarthritis, Dr. Odom wrote that "I think a lot of her knee/lower extremity pain is due to degenerative changes and the fact that she has gained over 20 [pounds] since Nov[ember]." Id. at 336.

On May 12, 2011, Plaintiff visited Dr. Downs "in regards to her left knee." Id. at 279. Plaintiff had received her first Supartz injection, but reported swelling and soreness and stated that she "does not wish to complete the Supartz injection series." Id. Upon examination, Plaintiff "ambulate[d] with a normal gait and station," and had "full range of motion and excellent strength in all directions in comparison with the contralateral side." Id. Dr. Downs put Plaintiff on "full duty status at her workplace." Id. Dr. Downs completed paperwork showing that Plaintiff was on regular work duty. Id. at 307.

On May 31, 2011, Plaintiff visited Dr. Odom at Vanderbilt. Id. at 328-30. Plaintiff's diagnoses were: hypertension, in borderline control; rheumatoid arthritis,"overall much improved;" allergies, currently inactive; and gastroesophageal reflux disease, controlled. Id. at 328. Plaintiff was prescribed new dosages of her medications and Dr. Odom "discussed diet/[weight] loss strategies, including low impact/pool exercise." Id. at 329.

On June 14, 2011, Plaintiff was evaluated by Dr. Lloyd Huang of Tennessee Disability Determination Services. Id. at 266-68. Plaintiff reported as her medical history that she:

> ...was diagnosed with seropositive rheumatoid arthritis. Currently she is treated with methotrexate and prednisone and over the past several months has had some improvement of her symptoms. She has had arthritis and morning stiffness in her hands, elbows, and hips. She has had bilateral knee pain. She reports that she has daily low back pain also which is 6/10 in severity.

Id. at 266. Upon examination, Dr. Huang observed that Plaintiff could "get up and down from the exam table with mild difficulty, can walk with mild limp in tandem gait, and can walk heel-to-toe

with mild difficulty." Id. at 268. In conclusion, Dr. Huang wrote that Plaintiff "does have rheumatoid arthritis. ... Her functional status would be improved with even moderate weight loss. I did not feel that she had to have a cane for my evaluation in the exam room." Id. Dr. Huang also included a medical source statement.

In his medical source statement, Dr. Huang wrote that Plaintiff could frequently lift up to ten pounds, occasionally lift up to twenty-five pounds, and could never lift fifty-one to one hundred pounds. Id. at 270. Dr. Huang assessed that Plaintiff could carry up to ten pounds frequently, eleven to twenty pounds occasionally, and could never carry more than twenty-one pounds. Id. Dr. Huang based these restrictions on Plaintiff's "rheumatoid arthritis – stabilized with recent treatment," "[degenerative disc disease] – [left] knee," and "obesity." Id. Plaintiff was restricted to sitting for two hours, standing for one hour, and walking for thirty minutes at a time; for a total of sitting for six hours, standing for four hours, and walking for three hours in a workday. Id. at 271. Dr. Huang wrote that Plaintiff did not need a cane although she "had cane in office." Id. Dr. Huang limited Plaintiff to frequently handling, fingering, and feeling and to occasionally reaching overhead, reaching generally, and pushing/pulling in both Plaintiff's right and left hands. Id. at 272. Plaintiff was also limited to occasionally operating foot controls in her left and right feet. Id. Plaintiff was restricted to never climbing ladders or scaffolds, kneeling, crouching or crawling, and to occasionally climbing stairs and ramps, balancing and stooping. Id. at 273. Plaintiff was limited to never having exposure to unprotected heights or extreme cold, and to occasional exposure to moving mechanical parts, operating a motor vehicle, humidity and wetness, dust, odors, fumes and pulmonary irritants and vibrations; Plaintiff was also limited to moderate "office" exposure to noise. Id. at 274. Dr. Huang also commented that Plaintiff "would have improved function even with moderate weight

loss." Id. at 275.

On June 15, 2011, Plaintiff visited Vanderbilt for a "followup in the orthopaedic clinic today." Id. at 327. Plaintiff had received an "injection of both sacroiliac joints" four months previously and "responded well;" Plaintiff received another set of injections at this appointment. Id.

On August 4, 2011, Plaintiff was evaluated by Dr. Downs to assess an "impairment rating." Id. at 277. Plaintiff's medical history was described as "post left knee arthroscopy with partial medial and lateral meniscectomy and chondroplasty performed August 27, 2010. She reports good improvement of her comfort since time of her last visit. She has been able to be fully active at this time. She is pleased with her progress." Id. On examination, Dr. Downs observed that Plaintiff "ambulate[d] with a normal gait and station." Id. Dr. Downs also found that Plaintiff had "full range of motion and excellent strength in all directions in comparison with the contralateral side." Id. Plaintiff was deemed "activities unrestricted" and was "considered at maximal medical improvement." Id. As the impairment rating, Dr. Downs assessed that Plaintiff had an "8% percent impairment of the lower extremity [that] converts to a 3% whole person impairment." Id.

On August 4, 2011, Dr. Downs also filed a "final medical report" with the Tennessee Department of Labor and Workforce Development Division of Worker's Compensation. Id. at 305. Dr. Downs wrote that Plaintiff's injury occurred on January 11, 2010, that Plaintiff returned to restricted work duty on September 9, 2010, and that Plaintiff returned to regular work duty on December 3, 2010. Id. Dr. Downs wrote that that day, August 4, 2011, was the date of Plaintiff's maximum medical improvement. Id. Dr. Downs wrote that Plaintiff was permanently impaired, with an eight percent impairment to her left knee and a three percent whole person impairment. Id.

On August 10, 2011, Plaintiff visited Vanderbilt's rheumatology clinic with seropositive

rheumatoid arthritis and complaints of pain. Id. at 324-25. Plaintiff was taking Prednisone, an anti-inflammatory, and noted that she had "no worsening of joint symptoms on the day she is not taking prednisone." Id. at 324. Plaintiff also reported back pain and stiffness and swelling that did not persist. Id. Plaintiff's prescription for Prednisone was discontinued and her other medications were refilled. Id. at 325.

On September 10, 2011, Dr. Frank Pennington conducted a physical residual functional capacity assessment ("RFC") for Plaintiff. Id. at 395-404. Plaintiff had a primary diagnosis of rheumatoid arthritis, a secondary diagnosis of degenerative joint disease in her left knee, and another alleged impairment of high blood pressure. Id. at 395. Dr. Pennington limited Plaintiff to lifting and carrying twenty pounds occasionally and ten pounds frequently; to standing, walking, and sitting for a total of about six hours in an eight hour workday; to limited pushing and pulling in her lower extremities; to occasionally climbing ramps, stairs, ladders, ropes and scaffolds, balancing, stooping, kneeling, crouching, and crawling; and to limited handling and fingering. Id. at 396-400. Dr. Pennington wrote of a previous medical source statement, "[o]n 3/3/11, [claimant's] [treating physician] at Vandy put a note in her file that [Plaintiff] is unable to work. This is as issue reserved to the Commissioner and as such is not given any weight. His statement is not well supported because his exam of that day showed that she was improving on medication." Id. at 401. Dr. Pennington also wrote that Plaintiff's obesity "does not limit her function significantly." Id. at 402. Dr. Pennington wrote:

> [Plaintiff] has [medically determined impairments] of rheumatoid arthritis, [osteoarthritis], [left] knee surgery and [high blood pressure] that could cause some pain and fatigue. [Plaintiff] claims that it is hard for her to lift 5 pounds and walk 50 feet with having to use a cane, brace/splint are not supported by evidence and her sitting, standing and walking limitations are not consistent with [range of motion]

and strength testing. [Plaintiff] reports of functional limitations are partial[ly] credible.

Id.

On September 19, 2011, J. Weatherford conducted a vocational analysis for Plaintiff. Id. at 162-65. Weatherford limited Plaintiff to lifting and carrying a maximum of twenty pounds or ten pounds frequently and to standing, walking, and sitting for six hours in a workday. Id. at 162. Plaintiff was limited to occasionally climbing ramps, stairs, ladders, ropes and scaffolds, balancing, stooping, kneeling, crouching, and crawling. Id. Plaintiff also had a limited ability to handle (gross manipulation) and finger (fine manipulation). Id.

On September 30, 2011, Plaintiff visited Dr. Odom at Vanderbilt with hypertension, gastroesophageal reflux disease, allergies and rheumatoid arthritis. Id. at 425-27. Plaintiff's "pain [was] controlled as long as she does not hold one position too long, perform repetitive motions, lift more than 5lbs, etc." Id. at 425. Dr. Odom "emphasized" a low salt, anti-reflux diet and noted that "exercise is difficult given her [rheumatoid arthritis] symptoms." Id. at 426.

On October 12, 2011, Dr. Hammonds completed a medical source statement for Plaintiff. Id. at 405-10. Dr. Hammonds listed Plaintiff's diagnoses as "Seropositive Rheumatoid Arthritis, Osteoarthritis, back pain" and wrote that Plaintiff's prognosis was "fair." Id. at 405. Plaintiff's pain was listed as "hands/wrists – every few days with occasional swelling" and "low back pain (mild spinal stenosis on MRI) – daily worse with bending, lifting, sitting for prolonged periods." Id. Dr. Hammonds opined that Plaintiff could sit for thirty to forty-five minutes at one time, but could not stand at all; Plaintiff could sit and stand/walk for a total of "less than 2 hours" in a day, the lowest option. Id. at 406. Plaintiff did need a sit/stand option. Id. Plaintiff needed to walk around during

an eight-hour work day, for ten minutes at a time every sixty minutes. Id. at 407. Plaintiff would sometimes need to take unscheduled breaks of thirty minutes during the work day, and this would happen twice a week. Id. Plaintiff did not need to use a cane. Id. Plaintiff could lift and carry less than ten pounds rarely, but could never lift and carry more weight. Id. Plaintiff could rarely twist, stoop (bend), crouch/squat and climb stairs, but could never climb ladders. Id. Plaintiff had significant limitations with reaching, handling or fingering "if prolonged." Id. at 408. Plaintiff was likely to be "off task" about ten percent of the work day due to symptoms, likely to have "good days" and "bad days," and was likely to be absent from work about three days per month. Id. Still, Plaintiff was "capable of low stress work." Id. Dr. Hammonds recommended that Plaintiff would "ideally ... avoid repetitive work (ie assembly line work) or work that involves using hands/fingers often." Id. at 409.

On October 13, 2011, Eugene Wyatt, Jr., Plaintiff's husband, completed a disability report. Id. at 166-73. Wyatt wrote that Plaintiff's condition had worsened since her last report, specifically "[f]or the last few months it['s] been more painful for [Plaintiff] to stand a long time and for [Plaintiff] to walk." Id. at 166. Regarding personal care, Wyatt wrote that "some days it's ok some days it's hard for [Plaintiff] to get out of bed to comb [her] hair, brush [her] teeth, even to put on [her] clothes." Id. at 170. In conclusion, Wyatt wrote, "I ask that you would reconsider [Plaintiff's] disability because some time [Plaintiff is] in a lot of pain it hurts [Plaintiff] to do things [Plaintiff is] use[d] to doing I would not ask this if this was not so. Thank you." Id. at 172.

On October 20, 2011, Plaintiff completed an updated disability report. Id. at 174-79. Plaintiff stated that her condition had worsened, and that "for the last [year] moderate it been more apainful for me to stand a long time and for me to walk." Id. at 174. Plaintiff also stated that "some

days it[']s ok some days it[']s hard for me to get out of bed to couch" and that she has "gain[ed] weight because of moderation hard to do day to day activities like comb my hair." Id. at 177. Plaintiff concluded, "[I] ask that you would reconsider my disability because some time [I] am in a lot of pain and it hurts me to do things [I] am use[d] to doing [I] would not ask this if [I] was not so." Id. at 178.

On October 31, 2011, Plaintiff visited Dr. Watson for the first time in four months. Id. at 424. Plaintiff was "again having pain" in her sacroiliac joints and "[o]n examination, any stress applied to those joints is painful." Id. Dr. Watson administered two sacroiliac injections and Plaintiff "tolerated the procedures well." Id. Dr. Watson also "filled out some forms that she brought prepared to that effect today[.]" Id.

The paperwork completed by Dr. Watson on October 31, 2011 was a medical source statement for Plaintiff. Id. at 411-14. Dr. Watson wrote that Plaintiff's prognosis was "chronic problems." Id. at 411. Plaintiff's symptoms were listed as "[p]ain lower back, buttocks, posterior thighs." Id. Dr. Watson also wrote that Plaintiff's "[s]teriod injections of [sacroiliac] joints helpful for 3-4 months." Id. Plaintiff's symptoms were likely to cause interference with her attention and concentration "frequently," defined as "34% to 66% of an 8-hour working day." Id. at 412. Plaintiff was "[i]ncapable of even 'low stress' jobs" because she was "not comfortable sitting, standing, or walking." Id. Plaintiff could not walk any city blocks without pain, could only sit for ten minutes at a time, and could stand for only five minutes at a time; Plaintiff could sit and stand for less than two hours total in an eight-hour workday. Id. at 412, 417. Dr. Watson also wrote that Plaintiff needed to walk one minute every one minute. Id. at 417. Plaintiff needed to shift positions at will, and would require hourly, unscheduled breaks. Id. Plaintiff's legs needed to be elevated to waist

24

height if she were sitting for a prolonged period. Id. Plaintiff also required use of a cane. Id. Plaintiff could occasionally look down, turn her head right and left, look up, and hold her head in static position. Id. at 413. Plaintiff could also occasionally twist, could rarely stoop (bend), but could never crouch/squat, climb ladders, or climb stairs. Id. Dr. Watson wrote that Plaintiff's reaching, handling and fingering functions were not limited. Id. Plaintiff would have "good days" and "bad days" and would be absent more than four days per month. Id.

On November 9, 2011, Plaintiff visited Dr. Odom at Vanderbilt's Rheumatology clinic for the first time since August 10, 2011. Id. at 421-22. Plaintiff "report[ed] that she has good days and bad days" and "is having quite a bit of lower back pain, which is the worst area that is currently bothering her." Id. at 421. Plaintiff's prescriptions for Methtrexate, an immunosuppressant, a non-steroidal anti-inflammatory, and Omeprazole, a GERD medication, were continued. Id. at 422.

On December 21, 2011, Dr. Anita Johnson completed a medical evaluation of Plaintiff. Id. at 430-35. Dr. Johnson determined that Plaintiff's record was insufficient and lacking "[f]unctional data ... i.e., pain, fatigue or "B" criteria information." Id. at 430. Dr. Johnson concluded, "although [Plaintiff] alleges worsening, she never returned the current [activities of daily living]. Unable to assess worsening of impairments [without] current [activities of daily living]. Therefore, claim is insufficient to assess." Id. at 433.

On February 8, 2012, Plaintiff visited Dr. Hammonds at Vanderbilt's rheumatology clinic and "report[ed] that she is doing about the same. She gets sore every now and then. Her back/knees still bother her quite a bit. She hasn't had recent swelling." Id. at 461-63. Plaintiff's examination was normal and her prescriptions were continued. Id. at 461-62.

On February 23, 2012, Plaintiff visited a nurse practitioner at Vanderbilt "complaining of

dizziness which has been going on for 2-3 days. Id. at 459-60. The nurse practitioner's impression was that this might be "[upper respiratory infection]/Vertigo. Id. at 460.

On March 5, 2012, Plaintiff visited Dr. Watson at Vanderbilt's orthopaedic clinic and reported that she "is doing much better now." Id. at 458. Dr. Odom also noted that Plaintiff had received new diagnoses for vertigo and osteoarthritis. Id.

On March 20, 2012, Plaintiff completed another disability report. Id. at 180-87. Plaintiff wrote, "I have pain in my hands sometime[s] and legs so it[']s hard for me to do things I need to do. And sometime[s] dizz[i]ness from all the medications." Id. at 184.

On March 30, 2012, Plaintiff visited Dr. Odom at Vanderbilt for "evaluation and management of chronic conditions/symptoms[.]" Id. at 455-57. Plaintiff's hypertension, gastroesophageal reflux disease and rheumatoid arthritis were well-controlled. Id. at 456. Dr. Odom had several concerns about Plaintiff's weight, including emphasizing a "low salt, anti-reflux diet," promoting exercise with the note that it is "difficult given her [rheumatoid arthritis] symptoms," "recheck[ing] fasting lipids," and "discuss[ing] starting to count calories and keep a food jounral to facilitate [wight] reduction." Id. at 457.

On June 6, 2012, Plaintiff visited Dr. Hammonds at Vanderbilt's Rheumatology clinic and "report[ed] that she is doing ok" although Plaintiff also noted that "[s]he has low back pain with [occasional] numbness down her legs. Her joints are stiff, but she has not noticed swelling." Id. at 447-49. Plaintiff also reported that "[s]he has not been able to lose weight – she has tried to change her diet." Id. at 447. Plaintiff's examination was normal and her medications were continued. Id. at 448.

On July 30, 2012, Plaintiff visited Dr. Watson at Vanderbilt's orthopaedic clinic for a

followup, complaining of "having discomfort again across the lower back." Id. at 446. Plaintiff requested another sacroiliac joint injection and Dr. Watson administered them. Id.

On October 1, 2012, Plaintiff visited Dr. Odom at Vanderbilt for "evaluation and management of chronic conditions/symptoms[.]" Id. at 443-45. Plaintiff's conditions were well-controlled, except for her hypertension that was "suboptimally controlled" and Dr. Odom prescribed an increase in Plaintiff's medication. Id. at 444.

On October 10, 2012, Plaintiff visited Dr. Hammonds at Vanderbilt's rheumatlogy clinic for a followup of her seropositive rheumatoid arthritis. Id. at 440-42. Plaintiff was doing well on her medications and reported no new symptoms, although she did have "[o]ccasional pain in her [right] thumb and hip area." Id. at 440. There were not any changes made to Plaintiff's treatment plan. Id. at 441.

On October 31, 2012, Plaintiff visited Dr. Watson at Vanderbilt's orthopaedic clinic. Id. at 439. Plaintiff was "having pain again" and received another set of sacroiliac joint injections. Id.

On January 16, 2013, Plaintiff visited a nurse practitioner at Vanderbilt's rheumatology clinic and reported she "has been doing well since her last visit." Id. at 469-70. Plaintiff's examination was normal and her medications were continued. Id.

On February 4, 2013, Plaintiff visited Dr. Watson at Vanderbilt complaining of "having pain again." Id. at 471. Upon examination, Dr. Watson noted that Plaintiff was "markedly overweight." Id. Dr. Watson administered another set of sacroiliac joint injections. Id.

On April 1, 2013, Plaintiff visited Dr. Odom at Vanderbilt complaining of sinus pain. Id. at 472-75. Plaintiff was prescribed medication and Dr. Odom discussed undergoing a colon cancer screening. Id. at 474. Plaintiff underwent that procedure on April 4, 2013 and it showed "no

significant abnormal findings." Id. at 476.

On April 16, 2013, Plaintiff visited a nurse practitioner at Vanderbilt's rheumatology clinic and reported that she "has been doing well since her last visit except for today she feels bad due to her recent dental work with tooth removal." Id. at 477-78. Plaintiff's examination was normal and her medications were adjusted to account for her dental antibiotics. Id. at 478.

On May 6, 2013, Plaintiff visited Dr. Watson at Vanderbilt with a "recurrence of pain in both sacroiliac joints recently." Id. at 479. Plaintiff requested another set of sacroiliac injections and an MRI of her right knee. Id. Upon examination, Dr. Watson noted that Plaintiff "continues to be considerably over weight." Id. Dr. Watson administered sacroiliac injections and ordered an MRI. Id.

On May 14, 2013, the MRI ordered by Dr. Watson was conducted. Id. at 480. The MRI showed "[f]lap tear the posterior horn and body of the medial meniscus," "[e]xtensive degenerative type free edge tearing of the entire circumference of the lateral meniscus," "[i]ntermediate/high articular hyaline cartilage loss at the patellofemoral articulation," and "[i]ntermediate grade medial and lateral compartment cartilage loss without underlying marrow change." Id.

On May 22, 2013, Dr. Kurt Spindler reviewed Plaintiff's MRI. Id. at 481. Dr. Spindler noted that Plaintiff's "x-rays show significant arthritis. MRI was obtained that showed a medial meniscus tear and lateral meniscus tear in addition to significant arthritis." Id. Dr. Spindler concluded that "I think she pretty much has end-stage arthritis. I have recommended rehab and a corticosteriod injection which reluctantly she agreed to." Id.

## B. Conclusions of Law

A "disability" is defined by the Social Security Act as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1); see also 42 U.S.C. § 1382c(a)(3). A reviewing court's evaluation of the Commissioner's decision is based upon the record made from the administrative hearing process. Jones v. Sec'y, Health and Human Servs., 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of review is limited to determination of (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. Landsaw v. Sec'y of Health and Human Servs., 803 F.2d 211, 213 (6th Cir. 1986). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007) (quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)).

Plaintiff contends that the ALJ erred by: (1) violating the treating physician rule; (2) incorrectly assessing Plaintiff's credibility regarding pain relief; and (3) not following Social Security Regulation ("SSR") 96-8p regarding Plaintiff's good days and bad days. Plaintiff first contends that the ALJ erred by violating the treating physician rule by assigning the treating source statements of Drs. Hammonds and Watson "little weight," citing Social Security Regulation 96-2p: "[i]f a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; i.e., it must be adopted."

In the Sixth Circuit, "[p]rovided that they are based on sufficient medical data, 'the medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference.'" Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 240 (6th Cir. 2002) (quoting Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985)). If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion. Shelman v. Heckler, 821 F.2d 316, 321 (6th Cir. 1987).

As to the assessment of Plaintiff's two treating physicians, the ALJ wrote:

> The two treating source statements are given little weight, as they are not consistent with these physician[s'] own notes or the record as a whole. The claimant is repeatedly noted to have a normal gait, normal strength, negative straight leg raise, etc. Her orthopedic specialist (Dr. Watson) has been giving her injections periodically; however, he even notes that she had a normal range of motion of the hips, negative straight leg raise, normal lower extremity strength, 5/5 motor strength, etc.

> Her treating rheumatologist (Dr. Hammond[s]) has repeatedly noted similar findings with no evidence of synovitis, joint inflammation/swelling, etc., once the claimant was started on treatment early in the period. She has repeatedly noted that the claimant's RA is stable. She had discontinued the Prednisone, and reported that the claimant had done well and had no worsening of joint symptoms on the day when she was not taking Prednisone. She remained stable in 2011, 2012 (with no recorded flares in 2012) and through her latest treatment notes in April 2013.

> In addition, her primary care provider's notes are consistent with those of the treating source regarding stable RA. He noted normal gait, stations and no swollen or inflamed joints during 2012; and that the RA was stable even with slight lowering of the MTX at her latest office visit in April 2013. Thus, the limitations are not supported for either treating source statements in the records.

(Docket Entry No. 10 at 26-27) (citations omitted).

Drs. Hammonds and Watson completed their medical source statements only nineteen days apart, yet they assign very different limitations to Plaintiff. On October 12, 2011, Dr. Hammonds completed a medical source statement for Plaintiff and wrote that Plaintiff's prognosis was "fair."

30

Id. at 405. On October 31, 2011, Dr. Watson wrote that Plaintiff's prognosis was "chronic problems." Id. at 411. Dr. Watson opined that Plaintiff's symptoms were likely to cause interference with her attention and concentration "frequently," defined as "34% to 66% of an 8-hour working day." Id. at 412. Dr. Hammonds estimated that Plaintiff could sit for thirty to forty-five minutes at one time, but could not stand at all, that Plaintiff could sit and stand/walk for a total of "less than 2 hours" in a day, the lowest option, and that Plaintiff needed a sit/stand option. Id. at 406. Dr. Watson, however, issued extremely restrictive work limitations for Plaintiff, stating that Plaintiff could only sit for ten minutes at a time, stand for only five minutes at a time, and would need to walk one minute every one minute. Id. at 412, 417. According to Dr. Watson, Plaintiff needed to shift positions at will, and would require hourly, unscheduled breaks. Id. at 417. Dr. Hammonds, however, estimated that Plaintiff would only take unscheduled breaks about twice a week, and for a total of thirty minutes of the workday. Id. at 407. Dr. Watson also opined that Plaintiff's legs needed to be elevated to waist height if she were sitting for any prolonged period. Id. at 417. Dr. Watson stated that Plaintiff required use of a cane, although Dr. Hammonds stated that Plaintiff did not require a cane. Id. at 417, 407. Finally, Dr. Hammonds suggested that Plaintiff was "capable of low stress work" and would "ideally ... avoid repetitive work (ie assembly line work) or work that involves using hands/fingers often." Id. at 408-09. Dr. Watson concluded that Plaintiff was "[i]ncapable of even 'low stress' jobs" because she was "not comfortable sitting, standing, or walking." Id. at 412.

These medical source statements are inconsistent with each other. The ALJ determined that they were also inconsistent with treatment records. The Commissioner does not contest that Dr. Watson was a treating physician. Plaintiff's first record with Dr. Watson is dated April 2, 2010 and

the last is dated May 6, 2013 – the treating relationship lasted over three years. Yet Dr. Watson usually only performed one function: the injection of sacroiliac joint injections. During these visits, Dr. Watson noted that Plaintiff complained of pain and that Plaintiff identified the pain as occurring at her sacroiliac joints. Dr. Watson administered two sacroiliac joint injections, that were tolerated well and yielded improvement every time. Id. at 388, 378, 369, 362, 343, 327, 424, 439, 471 and 479.

Based upon a treatment record consisting solely of the administration of sacroiliac joint injections, Dr. Watson concluded that Plaintiff had several restrictions inconsistent with work and would be "incapable of even 'low stress' jobs." A treating physician's opinion "is to be given controlling weight only if it is well-supported by medically acceptable clinical and laboratory techniques, and not inconsistent with the other evidence of record." Collins v. Comm'r of Soc. Sec., 989 F.Supp.2d 635, 643 (S.D. Ohio Aug. 21, 2013). Prior to the medical source statement, Dr. Watson never stated that Plaintiff suffered excessive work restrictions or that the injections were an insufficient treatment. The ALJ's decision to give Dr. Watson's medical source statement "little weight" is not an error.

Dr. Hammonds treated Plaintiff between December 16, 2010 and June 6, 2012. As stated by the ALJ, Dr. Hammonds determined that Plaintiff's rheumatoid arthritis was well-managed and improving. Plaintiff often reported pain, but was inconsistent. On February 8, 2012, Plaintiff reported that she was doing "the same," but also reported back and knee pain. Id. at 461. On June 6, 2012, Plaintiff reported that she was "doing ok," but also reported lower back pain. Id. at 447. Plaintiff's condition was treated with Prednisone, although Plaintiff stated that she felt fine when she did not take the Prednisone. Id. at 324. A well-controlled condition is inconsistent with the

workplace restrictions assigned by Dr. Hammonds. Poteet v. Colvin, No. 3:13-cv-730, 2014 WL 2708543 at *9 (M.D. Tenn. June 16, 2014). The ALJ's decision to give "little weight" to Dr. Hammonds' medical source statement is not an error.

Next, Plaintiff asserts that the ALJ erred by failing to find credible Plaintiff's testimony regarding efforts to obtain pain relief. Plaintiff cites SSR 96-7p that states:

> In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

At the hearing, Plaintiff testified that she had rheumatoid arthritis that affected "[b]oth [her] hands, elbow, [her] knees" and osteoarthritis that affected her back. (Docket Entry No. 10 at 43). Plaintiff testified that "[w]hen I hurt a lot I tend from sitting I try to get up and relieve it a little bit. Or if I'm walking I try to sit down. But when I get back up my knees, and if I sit down too long my knees will start hurting so it's basic touch and go I guess." Id. at 45. Plaintiff also testified that she could sit for fifteen or twenty minutes before needing to stand "for a minute" and that she could also walk for fifteen minutes. Id. at 45-46. Plaintiff stated that she did not "have a 'most comfortable position,'" and had to keep changing positions. Id. at 46.

Regarding Plaintiff's complaints, the ALJ wrote:

> The objective medical evidence of record does not support the claimant's testimony. The claimant's medication and treatment plan remained the same, which suggests no worsening in her condition. She had no side effects from her medications. Her treating orthopedist consistently annotated that she had excellent response to his treatment, and her treating rheumatologist consistently annotated that she was stable,

even with the discontinuance of Prednisone; and her treating primary care physician's notes were consistent with those of her treating specialists.

...

While the claimant alleges and testifies that she is severely restricted by her impairments and their limiting effects, the objective evidence does not corroborate her allegations. It is clear that her impairments are likely to produce some of the functional limitations that she speaks of, but not to the extent that she is unable to satisfy the demands of regular work activity on a sustained basis.

Id. at 22, 27-28.

Although the ALJ addressed Plaintiff's treatment history, Plaintiff's complaints were based on the pain that prevented sitting, standing and walking; not insufficient treatment. "While ALJ Jarvis is correct in that Plaintiff's subjective allegations of pain do not correspond to the objective evidence of record, it is important to once again note that fibromyalgia as a disability cannot be determined based on objective evidence alone. Furthermore, a claimant's statements about the intensity or persistence of pain and the effect that the pain has on her ability to work 'may not be disregarded solely because they are not substantiated by objective medical evidence.'" Davila v. Comm'r of Soc. Sec., 993 F.Supp.2d 737, 759 (N.D. Ohio Jan. 28, 2014) (citing SSR 96-7p). Although Plaintiff's objective medical record might not support her claims of pain, Plaintiff's testimony was substantiated by her husband's testimony and by medical reports from treating physicians.

Plaintiff's husband testified at the hearing. He stated that Plaintiff could only walk one hundred to one hundred and fifty feet before needing to sit, and that "we carry around a chair with us most of the time when we're out so she gets tired when we out, you know, she can't make it back to the car or whatever, she'll rest." (Docket Entry No. 10 at 52). He also testified that Plaintiff could sit, but that she's only "okay for ten or 15 minutes or so." Id.

Plaintiff's alleged onset date of disability is June 16, 2010. Several of Plaintiff's doctors recommended limited sitting, standing, and walking before that date. On September 10, 2010, Dr. Downs completed a "medical status form" and stated that Plaintiff should "[l]imit walking, standing. Must sit 5-10 minutes every (1) hour[.]" Id. at 316. On April 26, 2011, Plaintiff wrote in a function report that she had trouble sitting. Id. at 154. Dr. Hammonds wrote in her medical source statement that Plaintiff required a sit/stand option; Dr. Watson also restricted Plaintiff's sitting. Id. at 406, 412. Further, each of Dr. Watson's sacroiliac joint injections was administered due to Plaintiff's complaints of pain. Dr. Hammonds also noted Plaintiff's reports of pain several times.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.' Rather, such determinations must find support in the record." Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 247 (6th Cir. 2007) (citations omitted). Here, the ALJ discussed Plaintiff's treatment as a reason for discounting credibility; however, Plaintiff's claims are based on pain experienced due to her conditions. This pain was corroborated by Plaintiff's husband and by medical reports. The Court concludes that the ALJ's determination regarding Plaintiff's credibility is not supported by substantial evidence.

Finally, Plaintiff asserts that the ALJ erred by failing to consider Plaintiff's "good days" and "bad days." At the hearing, Plaintiff and the ALJ had the following conversation:

> Q. Okay. So on your pain scale that doctors use where they say zero is no pain and ten is the really sad face, worst pain you can imagine, where is just the normal day for you with medications on board. Just the usual day.
> ...
> A. The scales I would say an eight.

Q. Okay. And do you have days without pain?
A. Not completely without.
Q. Mm-hmm. So on a better day, where do you think that goes?
A. I would say maybe a five.
Q. Okay. And how many of those better days do you think you would have out of an average week?
A. Maybe two.

(Docket Entry No. 10 at 44). Yet Plaintiff did not claim at the hearing, nor does she claim now, that "bad days" are days that she is unable to perform work activities. The medical source statement paperwork completed by Drs. Hammonds and Watson included a question that asked "[a]re your patient's impairments likely to produce 'good days' and 'bad days'?" with a check box for yes or no. Id. at 408, 413. Both doctors checked yes, and in the followup question Dr. Hammonds checked that Plaintiff would be absent about three days per month; Dr. Watson checked that Plaintiff would be absent more than four days per month, the highest option. Id. Yet these statements were given "little weight" by the ALJ.

Plaintiff has not alleged any connection between her "bad days" and her ability to work. "The fact that such symptomatic treatment results in good and bad days does not undermine the finding implicit in the ALJ's determination of plaintiff's credibility and RFC, that such bad days are either not bad enough or not frequent enough, or both, to preclude work on a regular and continuing basis." Cavazos v. Soc. Sec. Admin., No. 2:09-cv-112, 2011 WL 4947453 at *7 (M.D. Tenn. Sept. 29, 2011). As such, the ALJ did not err in choosing not to incorporate Plaintiff's "bad days" into her RFC.

Accordingly, the Court concludes that the ALJ erred by finding Plaintiff's testimony regarding pain incredible. As such, the ALJ's decision is not supported by substantial evidence and should be reversed and Plaintiff's motion for judgment on the record (Docket Entry No. 12)

36

should be granted in part.

An appropriate Order is filed herewith.

**ENTERED** this the _18th_ day of March, 2016.

WILLIAM J. HAYNES, JR.
Senior United States District Judge